589 So.2d 1099 (1991)
Shirley McNAMARA (Sub Nom. Leon R. Tarver, II), Secretary, Department of Revenue and Taxation, State of Louisiana, Plaintiff-Appellee,
v.
BAYOU STATE OIL CORPORATION, Defendant-Appellant.
No. 22565-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1991.
Rehearing Denied November 27, 1991.
Writ Denied February 21, 1992.
*1100 Blanchard, Walker, O'Quin & Roberts by J. Edgerton Pierson, Jr., Shreveport, for appellant.
Pugh and Pugh by Robert G. Pugh, Shreveport, William J. Guste, Jr., Atty. Gen., Roy A. Mongrue, Jr., Thomas F. Wade, Asst. Attys. Gen., Baton Rouge, for appellee.
Before MARVIN, C.J., and SEXTON, NORRIS, HIGHTOWER and BROWN, JJ.
MARVIN, Chief Judge.
In this action for the balance of severance taxes owed the state and on reargument before a five-judge panel as mandated by LSA-Const. Art. 5, § 8(B), we affirm the summary judgment of almost $3,000,000 against appellant, Bayou State Oil Corporation.
The judgment represents the balance of unpaid severance taxes and accrued statutory interest on oil Bayou State produced from approximately 100 wells in the Bellevue Field in Bossier Parish during 31 *1101 months of a 34-month period that began in September 1978.

PREFACE
Because its Bellevue wells were stripper wells (producing less than 10 bbls. per day per well), Bayou State generally contends that it timely and correctly paid, and should be taxed only at, the lower stripper-well rate (3.125 percent of value) and not at the rate for fully capable wells that produce more than 25 bbls. per day (12.5 percent of value). LRS 47:633(7)(a), (c).
The judgment, dated May 15, 1990, was calculated on the unpaid three-fourths of the 12.5 percent severance tax rate (almost $1,262,000), plus accrued statutory interest (1.25 percent, or about $14,000, per month). § 633(7)(a), (c), 635, 1601.
Before and after the 34-month period, Bayou State's payment of the lower stripper-well tax rate (3.125 percent) was not questioned by the State because Bayou State consistently and timely certified monthly, the preceding month's production from each well. Bayou State made that certification on Form SEV. 0-3 to the Collector and Department of Revenue, now the Secretary and Department of Revenue & Taxation, herein, for brevity, called the State.
The State did not seek additional severance taxes for three months of the 34-month period (December 1978, January 1979, and June 1979) because Bayou State timely filed, in the next respective month, the 0-3 Form certifying the preceding month's production with the State.
In 1981, after examining the severance tax returns and forms that Bayou State had filed monthly with the State during the 34-month period in question (Forms SEV. 0-1d and 0-1s, reporting production by lease and by parish, respectively), the State notified Bayou State that monthly certification to the State on Form 0-3 of the production from each well for the preceding month was necessary to obtain the lower stripper-well rate. After the State's notification, Bayou State resumed its consistent monthly filing of the 0-3 Form in July 1981.
The State's action, brought in December, 1981, was essentially founded on Bayou State's failure to certify to the State the monthly production from each well on the 0-3 Form for 31 months of the 34-month period. The critical issue is whether the severance tax statutes and regulations require monthly certification of the preceding month's production from each well.

THE CONTENTIONS
There is no genuine issue of any material fact. CCP Art. 966. Disposition in the trial court was apparently delayed by agreement of the litigants to await the result in cases involving similar issues. Sec., Dept. of Revenue v. Tex. Gas Exploration, 506 So.2d 528 (La.App. 1st Cir. 1987), writ denied; Davenport Production Corp. v. Secretary of La., 490 So.2d 1140 (La.App.2d Cir.1986), writ denied. Bayou State filed amicus briefs in those cases. See also McNamara v. Scurlock Oil Co., 545 So.2d 1312 (La.App. 1st Cir.1989), writ denied. We shall discuss these three cases later in this opinion.
Under LRS 47:635, severance tax is due monthly, and the taxpayer must submit to the State, "on or before the last day of the month following the month to which the tax is applicable ... a statement on forms procured from the department, of the business conducted by such person during the preceding month, showing the kind of natural resources and the gross quantity of each so severed or produced, the names of the owners at the time of severance, the portion owned by each and any other reasonable and necessary information pertaining thereto that the secretary may require for the proper enforcement of the provisions of this Part." Compare § 641, discussed infra.
The rate of severance tax on production from stripper wells is set in § 633(7)(c), which, during 34-month period in question, provided:
On oil produced from a well classified by the commissioner of conservation as an oil well, and determined by the collector of revenue that such well is incapable of *1102 producing more than ten barrels of oil per day, the tax rate applicable to the oil severed from such well shall be one-quarter of the rate set forth in Subparagraph (a) of this Paragraph (7) and such well shall be defined, for severance tax purposes, as a stripper well; provided, however, that such well has been certified as a stripper well to the collector of revenue on or before the last day of the month following the month of production.[1]
Bayou State's reply brief says that:
Bayou State has never contended that the Form SEV. 0-3 is not due on a monthly basis, nor that it is not due on or before the last day of the month following the month in which the production occurs. In its ... Original Brief ... [Bayou State] acknowledged that such returns were not timely filed.... [Timeliness of filing Form 0-3] is not the issue presented for resolution. The real issue before this Court is what is the penalty to be extracted from Bayou State for failing to file that severance tax report. (Emphasis in original.)
Bayou State argues there is no penalty because § 642, before its amendment in 1986, provided:
If any person fails to make a report of the gross production and value of its natural products upon which the severance tax is herein levied within the time and in the manner prescribed, the collector shall examine the books, records and files of any such person to ascertain the amount and value of such production and to compute the tax thereon as provided herein, and according to the procedure hereinbefore provided.
This argument will not stand if the timely filing of the monthly certification Form 0-3 is a prerequisite to the application of the lower stripper-well tax rate under § 633(7)(c), and not merely a report to facilitate the State's periodic audit of severance tax returns, as Bayou State argues. We shall read all sections of the severance tax law together.
The current § 642, now a "specific penalty" section adopted by Act 536 of 1986, also does not avail Bayou State nor limit its obligation to the State, as Bayou State argues. That section imposes a penalty of $250 "for each reporting period" for the failure to make a report of the production upon which the severance tax is levied, but concludes, by stating [in part A] that this specific penalty is "in addition to any other penalties provided" and [in part B] that:
The imposition of the penalty ... shall not be construed as releasing the severer or purchaser from paying ... the amount of tax that may be owed ... under this part.
The State did not seek to apply retroactively, the current $250 "specific penalty" in its action.
§ 641 states that the severance tax "shall become delinquent after the date fixed for each monthly report to be filed in the office of the collector, and from such time shall be subject to the addition of interest, penalties, and costs as provided in [R.S. 47:1501 et seq.]." Our emphasis.
Under § 635A(3), "A taxpayer not complying with the provisions of this Subsection [the monthly filing and paying of severance tax, as partially quoted supra] shall be considered delinquent and shall be subject to penalties and interest as provided in R.S. 47:1601 and 1602."
We must therefore conclude that §§ 635 and 641 of the severance tax chapter, Chapter 6, Taxes on Natural Resources, of Title 47, thereby incorporate the Chapter 18 (Administrative Provisions) of Title 47.
The penalty under § 1602, also not sought in this action by the State, is five percent of the unremitted tax for a period of not more than five months. Although Bayou State does not squarely argue (as it does about the § 642 penalty) that its liability should be limited to the § 1602 penalty, *1103 in lieu of requiring it to pay the unremitted taxes, any suggested limitation of liability would be directly contrary to the legislative directive in § 1602. That section clearly states that the penalty is "to be added to the [delinquent] tax." We also note that statutory interest is legislatively deemed as if it were "part of the tax due" and is legislatively prohibited from being "waived or remitted." § 1601, hereafter discussed.
§ 1601 provides for interest on unpaid severance taxes at the rate of 1.25 percent per month from the "due date until the tax is paid." That section clearly states:
The interest provided for herein shall be an obligation to be collected and accounted for in the same manner as if it were a part of the tax due and can be enforced in a separate action or in the same action for collection of the tax and shall not be waived or remitted. (Our emphasis.)
The State sought only the tax and the statutory interest in its action. We do not and need not consider whether any or all of the penalties, general or specific, in the several sections above discussed, are applicable or are mutually exclusive in Bayou State's circumstance.
We agree that § 633(7) is clear on its face and is not ambiguous. That section generally and first declares that the severance tax rate on oil is 12.5 percent of the value of the oil produced per month. § 633(7)(a). It then stated, during the period in question, that the severance tax is one-half of the general rate if the well has been determined to be incapable of producing more than 25 bbls. per day (§ 633(7)(b)), and one-quarter of the general rate if the well has been determined to be incapable of producing more than 10 bbls. per day, provided, however ... (§ 633(7)(c), fully quoted above). We describe the well status under the three subsections, § 633(7)(a)-(c), as capable (7)(a), incapable (7)(b), or stripper (7)(c).
Bayou State prefaces its argument on the critical issue in this appeal with the contention that the 1974 amendment to the severance tax law requiring monthly certification by the taxpayer to the State of the preceding month's production [a substantive provision], should not "influence" or be a part of the body of the law which enacted the "reporting and collection provisions for severance taxes" that were adopted some 50 years before.

THE THREE CASES UNDER ATTACK
To consider the critical issue, we must consider Bayou State's complaints about the holdings in the three cases heretofore cited: Davenport, 1986; Texas Gas, 1987; and Scurlock Oil, 1989.
The above cited cases generally considered the severance tax sections of LRS Title 47 and the State's administrative regulations relative to payment of severance tax on oil in reaching their respective conclusions.
In chronological order, we state our opinion of what each case held:
notwithstanding that the wells produced only as stripper wells, the taxpayer does not have a "substantive" right to a refund of severance taxes paid at the higher rate where the taxpayer failed to certify the monthly production from the well during the period in question [more than a mere "procedural" failure] (Davenport, supra);
notwithstanding that the State has "determined" a well to be a stripper well under § 633(7), the taxpayer must, nonetheless, thereafter [timely] certify [production from] the well [to the State] "on or before the last day of the month following the month of production" [in order to be entitled to the lower stripper-well severance tax rate] (Texas Gas, supra); and
the purchaser of oil has the duty to deduct from the purchase price and pay the full amount of severance taxes owed to the State, notwithstanding that the producer did not timely file, as it had in the past, monthly reports and the 0-3 Form certifying to the State the monthly production from each well. Non-compliance with the monthly certification requirements of LRS 47:633 causes the loss of entitlement to payment of severance *1104 taxes at the reduced rate (Scurlock Oil, supra).
We emphasize that each of the three cited cases concerned how, when, and what a taxpayer must do under the severance tax law and regulations to obtain the lower stripper-well severance tax rate and that writs were denied in each case.
Before discussing the three cited cases, we describe the various severance tax forms mentioned there and here:

Form SEV. 0-10, "Application for Certification of Stripper Wells."
Applicant certifies, among other things, the lease and well name, the daily average production of each well during a calendar month, and the number and status (capable, incapable, or stripper) of the wells on the lease. The State's approval of the wells as "incapable of producing an average of more than ten barrels of oil per day," on the same form, constitutes the "initial determination" of stripper well status.

Form SEV. 0-1d, "Severance Tax Return."
Taxpayer reports production by lease for the taxable month and calculates tax on value of production.

Form SEV. 0-1s, also called "Severance Tax Return."
Taxpayer summarizes production by parish and calculates total amount of tax and interest.

Form SEV. 0-3, "Monthly Incapable and Stripper Oil Well Report."
Taxpayer reports production by well for the taxable month and lists, among other things, the well certification number assigned by the State at the time of the initial determination of stripper well status on Form SEV. 0-10.
As an unpublished addendum, we attach copies of the monthly forms completed and filed by Bayou State with the State in September 1978, for production in August 1978, to illustrate how the contents of the Forms 0-1d (Exhibit K), 0-1s (Exhibit J) and 0-3 (Exhibit L) differ. We also include the 0-10 Form on which the State initially "determines" a well is a stripper well.[*]
The one-page report of Bayou State's monthly production from 12 leases in the Bellevue Field (Form SEV. 0-1d) should be compared with the six-page report of Bayou State's monthly production from 84 stripper wells in the Bellevue Field (Form SEV. 0-3). For 31 months of the 34-month period at issue, which began with the production month of September 1978, Bayou State filed the Forms SEV. 0-1d and 0-1s, but did not file the Form SEV. 0-3.
In Davenport, the oil purchaser, Permian, withheld from its payments to the producer, Davenport, and paid to the State the 12.5 percent severance tax. Davenport filed monthly reports with the Department of Conservation, but filed no initial certification (0-10 Form) or monthly reports (0-1s, 0-1d, 0-3 Forms) with the State taxing authority during the months in question there.
In Texas Gas and here, and apparently in Scurlock Oil, the State first "determined" from the initial certification form filed by the taxpayer (the 0-10 Form), that the respective wells in question in each case were stripper wells. Texas Gas and Bayou State timely filed the monthly 0-1d and 0-1s Forms. Texas Gas untimely filed the monthly 0-3 Form. Bayou State filed the monthly 0-3 Form on three occasions during the 34-month period in question here, but failed to file the 0-3 Form for 31 other months. The producer in Scurlock Oil did not timely file "the reports [not otherwise identified] and SEV-03 forms." 545 So.2d at p. 1314.
Notwithstanding Bayou State's amicus status in Davenport and in Texas Gas, Bayou State argues that none of the three cited cases "hold" that monthly certification to the State is required for continued entitlement to the lower stripper-well tax rate.
Bayou State's counsel asserts that the judges or justices in the three cases were "lured," "duped," and "lead [sic] down a path to reach a conclusion which would *1105 prejudge [its] case," by the State's counsel. Bayou State's counsel says
that Davenport stands for nothing but that § 633(7)(c) is substantive, and that the taxpayer must comply with its requirements for entitlement to the stripper-well tax rate. [We agree with this statement of that holding. Bayou State questions in this appeal what § 633(7)(c) "requires."]
that Texas Gas did not independently decide anything. [We do not agree. The First Circuit fulfills its constitutional responsibility and does not "rubber stamp" the Second Circuit. The Supreme Court of Louisiana "rubber stamps" neither.]
that Scurlock Oil decided only that the purchaser of the oil was nonetheless liable for underpaid severance taxes and could not rely on the [mis-]representations of its seller-producer that the producer had filed the monthly certification 0-3 Form with the State. [We agree in part with this statement of that holding.] (Our brackets.)
Bayou State broadly asserts that Davenport presents a "classic example" of the breach of the principle that judges are to "interpret [and] not make law or give law" because the court inserted the word "each" into § 633(7)(c). Bayou State "challenges" and "dares" us to overrule Davenport and begin our review with a clean slate.
Bayou State argues that because the issue in Davenport was whether the State owed a refund of severance taxes paid before June 1982 and no determination or certification had been made before that time that Davenport's wells were stripper wells, we should have simply held that Davenport was not entitled to the stripper rate for the production before June 1982 and should not have mentioned the effect of § 633(7)(c) and other sections of the severance tax law.
We reproduce these selected and edited paragraphs from Davenport, substituting State for Collector, simply to show where and in what context we used the word "each" in ¶¶ 11 and 16:

¶ 3 We find the State's statutory authority in LRS 47:1621 to permit refunds does not apply where the overpayment was caused by the taxpayer's failure to comply with the State's certification requirements [in § 633(7)(c) ] to obtain the stripper well severance tax rate.... Refunds for overpayment are due only in limited circumstances. § 1621(B).

¶ 11 ... Relying on the assumed factual showing that the wells have produced only as stripper wells ..., appellants contend that their statutory "substantive right" to a refund ... is unaffected by their ["procedural"] failure to certify each well each month during the period in question. We must disagree.

¶ 12 The lower tax rate for stripper well production applies when the State determines, on the basis of monthly certified reports submitted by the taxpayer, that the well is incapable of producing more than 10 barrels per day. The tax is paid monthly. To maintain stripper well status, the taxpayer must thereafter certify the well "on or before the last day of the month following the month of production." The required reports are in addition to other reports required of all severers and purchasers, regardless of well status, under LRS 47:635 and 640.

¶ 16 ... The manner in which the legislature authorized this special tax rate [on stripper well production] inextricably links the amount of oil actually produced each month to the administrative requirements for timely reporting and certification by the taxpayer each month. The taxpayer is not substantively entitled to the lower monthly rate until the status of a well is "determined by the State" on the basis of the certification and the reports that are required of the taxpayer each month.

Penultimate ¶ ... Unless the monthly certification is timely filed ... when the monthly severance tax is paid, however, a refund of any over-payment resulting from the failure to file the monthly certification is not owed by the State ...
Bayou State's counsel now offers to "excuse" us for "erroneous dictum" in Davenport because we were not provided, in *1106 Davenport, with "Pertinent ... legislative history ..." While noting, supra, the obvious distinctions in the three cited cases, and having reviewed the tendered "pertinent history," we decline counsel's offer.
Neither Bayou State's attempts to distinguish or have us label the three cases as erroneous obiter dicta, legally in error and not controlling here, nor its attempts to appeal for justice because of the size of the judgment, persuades us to a contrary result than we have pronounced. We simply shall apply, and not "make," the law in this appeal in accord with our constitutional responsibility.

BAYOU STATE'S "PROPER MEANS" FOR INTERPRETING THE STATUTE[S]
Bayou State claims that § 633(7)(c) is designed solely to prevent retroactive application of the stripper rate; that is, that only the initial certification [Form SEV. 0-10 which is designed to allow the State to first "determine" the status of the well] must be filed on or before the last day of the month following the month of production. Illustrating this argument in its original brief, Bayou State explains, if a well had been certified to the State and "determined" by the State on January 15, 1975, to be a stripper well, that well would have
clearly satisfied the statutory test of the last clause of La.R.S. 47:633(7)(c) with respect to the September 1990 production.
The date of January 15, 1975, is unquestionably before October 31, 1990. Thus the well was certified as a stripper well to the Secretary before the last day of the month following the month of production. Therefore, with respect to the September 1990 production, the well was certified ... as a stripper well before October 31, 1990 (on January 15, 1975); thus, the statutory requirements ... were obviously met for such production. * * *
... [T]here is absolutely no statutory requirement that there be a monthly certification to or by the Secretary.
Bayou State alternatively suggests that the certification requirement is satisfied by the occasional filing of an 0-10 Form or by the monthly filing of the severance tax return (0-1s Form) and the schedule (0-1d Form).
Neither of the monthly forms show the production of a well for the preceding month. The monthly 0-1d Form shows only Bayou State's production from its Bellevue leases. Monthly filings were made on these forms after Bayou State had initially certified to the State on the 0-10 Form, apparently in the mid-1970's, that its Bellevue wells were stripper wells. As a new well was drilled and production obtained, an 0-10 Form was again filed with the State to gain a stripper-well designation and number and the State's § 633(7)(c) "determination" that the well was a stripper well. Bayou State did not file the 0-10 Form monthly. The monthly 0-1s and 0-1d Forms simply do not show or report the production from each well for the preceding month. The severance tax is levied and is due on the monthly production from each well. §§ 631 et seq.
The sections of the severance tax law do not allow us to agree with Bayou State's contentions.

RESOLUTION
We noted in Davenport the scheme of the severance tax law and regulations and the 0-1s, 0-1d, 0-10, and 0-3 Forms that were devised to facilitate reporting and certification of stripper wells, quoting, in part, Severance Tax Regulation 633:74-I(c). We noted that Davenport, after being informed of the necessity of reporting to the State taxing authority, then, and in accord with § 633(7)(c) and the regulations, filed forms that qualified the Davenport wells for stripper status and thereafter filed the proper monthly certification to be entitled to the lower tax rate.
In Davenport, we noted that the State had then "determined" and listed about 15,000 incapable or stripper wells in Louisiana, the production from some of which would "flip-flop" from one severance tax category to the next. We mentioned the *1107 taxing authority's "tremendous task" of trying to determine on a monthly basis the production from each of these wells without the taxpayer furnishing monthly certification.
Again we mention §§ 632, 635 and 641 of the severance tax law that refer to the severance tax and production from each well being reported and paid monthly, the tax being "due" or the interest beginning to run from a due date.
Scurlock Oil squarely noted that the State discovered in an audit that on certain occasions the 0-3 Form was not timely filed by the producer, in violation of LRS 47:633, during some of the months that the purchaser paid at the stripper rate. Noncompliance with § 633, the court said, was not the fault of the State and was the reason that the stripper well status was not achieved.
The taxpayer in Texas Gas, unlike in Davenport, consistently, but untimely, filed the monthly certification 0-3 Form, and paid the lower stripper rate. The appellate court, reversing the taxing authority and the trial court, held that Texas Gas was not entitled to the lower tax rate because it failed to timely comply with the monthly filing requirements of the statute and the corresponding tax regulation. Judgment was rendered in 1987 for the amount of the tax ($44,767) with statutory interest running from December 1, 1979.
Form 0-3, entitled "Monthly Incapable and Stripper Oil Well Report," shows, among other things, the certification number assigned after the initial determination of the well as a stripper well was made by the State taxing authority and shows the production from each well for the preceding month.
If the legislature intended the month-following-the-month-of-production time frame to apply only to the initial determination by the State, that time-frame language would not have been placed in the final clause of § 633(7)(c). The final clause employs distinguishing language from the first clause [determination by the State], by stating that after stripper well status is determined, "the tax rate ... shall be one-quarter of the (12.5 percent] rate ...; provided... that such well has been certified as a stripper well to the State" within the time frame (on or before the last day of the month following the month of production). If initial certification or determination by the State was all that was required, the proviso last clause would have been rendered superfluous.
We are directed to give meaning to all parts of a statute. Fruge v. Muffoletto, 137 So.2d 336 (La.1962).
We find no merit to Bayou State's arguments that once the State had determined its wells to be stripper wells, no further monthly certification by the taxpayer was required during the 34-month period to obtain the lower tax rate.

1990 LEGISLATION
While complaining that the State is unfairly and inconsistently applying the severance tax law and regulations, Bayou State more seriously contends that Act 313 of 1990 retroactively resolves the issue whether monthly certification of production from each well to the State is required and compels us to reverse the judgment against it.
The legislature twice amended § 633(7)(c) in 1990, by Act Nos. 313 and 551. Both acts retain the requirement of initial determination of stripper well status by the State taxing authority and the tax rate of one-fourth the rate applicable to fully capable wells. Both acts retain the "provided, however," clause and require certification to the State in a time frame following the month of production. Both acts state:
provided, however, that such well has been certified as a stripper well to the secretary on or before the fifteenth day of the second month following the month of production. Once a well has been certified and determined by the secretary to be incapable of producing an average of more than ten barrels of oil per producing day during an entire month, such stripper well shall remain certified as a stripper well until the well produces an *1108 average of more than ten barrels of oil per day during an entire calendar month.
Sec. 2 of Act 313 states:
The provisions of this Act are hereby declared to be remedial in nature and are intended to clarify and confirm proper legislative intent of the existing statutes and shall be applied retroactively to all stripper wells certified prior to the effective date of this Act.
Act 313 took effect on July 8, 1990. Act 551 took effect on August 1, 1990. Act 551 did not provide for retroactive application, nor did it mention Act 313 or contain a general provision repealing any conflicting laws. Act 551 also contained provisions regarding wells classified as "mining and horizontal drilling projects" which were not in Act 313.
Certification to the State is still required (on or before the fifteenth day of the second month following the month of production). The tax is still based on monthly production and is still payable monthly under the 1990 Acts. Interest and penalty sections were not amended.
The trial court judgment was signed May 15, 1990. On June 1, 1990, Bayou State filed a "motion for new trial and/or reconsideration of opinion on motions for summary judgment" on grounds other than the 1990 legislation. That motion was denied on June 25, 1990.
On July 5, 1990, Bayou State filed a "motion for new trial and/or for reconsideration of denial of motion for new trial and/or reconsideration of opinion on motions for summary judgment," asserting that House Bill No. 1532 [Act 313] had been passed by the legislature, was awaiting the governor's signature, and would "completely negate the authorities upon which [the trial court's] original opinion was founded."
The State's response to the motion included an exception to the trial court's jurisdiction to hear a second motion for new trial and an exception to the constitutionality of Act 313. The State claimed that Act 313 violated LSA-Const. Art. 7, § 15, which prohibits the legislature from releasing or extinguishing "any indebtedness, liability, or obligation of a corporation or individual to the state."
The State also claimed that the later of the two 1990 acts, Act 551, which did not provide for retroactive application, was controlling. The State alleged that Bayou State's attorney drafted the language for the bill that later became Act 313 "for the express purpose of defeating the judgment rendered herein." The State filed interrogatories, requests for production of documents, and requests for admissions regarding Bayou State's involvement in the passage of House Bill No. 1532 [Act 313] and Senate Bill No. 631 [Act 551].
On August 1, 1990, Bayou State obtained an indefinite extension of time to respond to the State's requests for admissions, an order granting its motion to withdraw its second "motion for new trial and/or for reconsideration," etc., and an order granting a devolutive appeal.
Bayou State argues in brief that we should address the issues regarding the 1990 legislation, notwithstanding that they were raised in an unorthodox manner and later withdrawn in the trial court. Both litigants and the Attorney General have briefed the issues in this court.
When the law is changed after the trial court judgment is rendered and while an appeal is pending, the appellate court, in some circumstances, has a duty to decide the case based on the law existing at the time of its own decision, even though this may require the reversal of a judgment which was proper at the time of its rendition. Fullilove v. U.S. Casualty Company of New York, 129 So.2d 816 (La.App.2d Cir.1961). See also Dripps v. Dripps, 366 So.2d 544 (La.1978).
Bayou State contends that because Act 313 took effect before Act 551, and because Act 313 expressly provided for retroactive application "to all stripper wells certified prior to the effective date of this Act," there was no need to repeat the retroactivity language in Act 551. Under Bayou State's construction of the 1990 legislation, the period of about a month between the effective dates of Acts 313 and 551 was at *1109 least a "window," sufficient to avail Bayou State of the retroactive application of Act 313 and to defeat the State's claim for the additional severance taxes from 1978-81. We do not agree with, but adopt Bayou State's view of the 1990 legislation for discussion purposes only, and proceed to the pivotal inquiry whether retroactive application of Act 313 is unconstitutional, without deciding whether Act 313 is as clear and unambiguous as Bayou State implies.

CONSTITUTIONAL ISSUE
LSA-Const. Art. 7, § 15, provides:
The legislature shall have no power to release, extinguish, or authorize the releasing or extinguishing of any indebtedness, liability, or obligation of a corporation or individual to the state, a parish, or a municipality. However, the legislature, by law, may establish a system under which claims by the state or a political subdivision may be compromised, and may provide for the release of heirs to confiscated property from taxes due thereon at the date of its reversion to them.
With the exception of the authorization to establish a system to compromise claims, which first appeared in the 1974 constitution, the remainder of the quoted language has been in the state constitutions since at least 1898. See LSA-Const.1921, Art. 4, § 13; Art. 59 of the 1913 constitution; and Art. 59 of the 1898 constitution, quoted in Succession of Popp, 83 So. 765 (La.1919).
Mrs. Popp died in 1910 when the inheritance tax rate was five percent. In 1912, the legislature amended the law to reduce the tax rate to two percent and expressly provided that the act applied to "all successions not finally closed, or in which the final account has not been filed." Mrs. Popp's succession was apparently "not finally closed" when the new law took effect. The court explained that [facially] the new law "by its terms governs this case." 83 So. at p. 767. Our brackets.
The court, however, reversed the judgment ordering the tax collector to apply the lower tax rate to Popp's inheritance from his deceased wife, finding that the tax was a debt that came into existence at the time of Mrs. Popp's death in 1910 and that the legislature could not release or extinguish the tax debt in whole or in part, by its reduction of the tax rate in 1912, without violating Art. 59 of the 1898 constitution.
Other cases interpreting Art. 4, § 13 of the 1921 constitution arose in the context of redemptions of property sold at tax sale. See, e.g., State v. Grace, 175 So. 825 (La. 1937), from which we glean and summarize the legal and historical context in which the constitutional challenges arose.
Before 1934, the party redeeming property that was sold for taxes had to pay all taxes due up to the date of redemption, for years both before and after the property was adjudicated to the taxing authority. In 1934 and 1935, the legislature authorized the redemption of property by paying the amount of actual taxes for which the property was adjudicated, in five annual installments, with all other taxes to be cancelled. The legislation was temporary, being set to expire in mid-1936, and was passed to aid the many depression-era taxpayers whose property was adjudicated for nonpayment of taxes. By facilitating the redemption of the property, the legislation would in turn benefit the taxing authorities by returning the property to the tax rolls.
Several municipal tax collectors claimed that the 1934-35 legislation violated Art. 4, § 13 of the 1921 constitution because it released the tax debts for the years before and after the adjudication of the property to the taxing authority. Answering those claims, this court and other courts consistently held that no tax debt existed for the years after the adjudication, when the taxing authority rather than a private citizen owned the property, and thus the cancellation of those taxes did not release or extinguish a debt owed to the taxing authority. The courts also found that the legislature did not intend to release tax debts that arose before the adjudication. See State ex rel. Huggett v. Montgomery, 167 So. 147 (Orl.App.1936); State ex rel. McGregor v. Diamond, 167 So. 760 (La.App.2d Cir. 1936); and State ex rel. Tulane Homestead *1110 Ass'n v. Montgomery, 171 So. 28 (La.1936).
The legislature responded to these decisions by passing Act 183 of 1936, extending the expiration time for the 1934-35 legislation for another year, or until September 1937. The stated purpose of the act was:
that the issuance of any such certificate of redemption as provided for herein shall constitute a sufficient authorization to the Louisiana Tax Commission, [which] shall issue a certificate cancelling and annulling all taxes assessed and levied prior to and subsequent to the year for which the adjudication was made to the State or to any of its political subdivisions, and subsequent to the date of adjudication and up to and including the year in which the redemption was effected... (Our emphasis.)
The legislature also passed a joint resolution in 1936 proposing a constitutional amendment to Art. 4, § 13 of the 1921 constitution, to allow the legislature to release or extinguish taxes on immovable property, in whole or in part, "for a period extending not beyond the year in which the property is redeemed." The proposed amendment also provided for retroactive application of Act 183 of 1936, quoted above. The proposed amendment was not adopted by the voters. See State v. Grace, supra.
The Grace court found that Act 183 of 1936 clearly violated the constitutional prohibition against releasing debts owed to the state or a municipality to the extent that it purported to release tax debts that arose before the property was adjudicated to the taxing authority. The court found that that portion of the act was inseparable from the remainder of the act and held the entire act unconstitutional.
Here, as in Grace, the legislature's statement of its intent with respect to earlier legislation is subject to the constraints of the constitutional prohibition against releasing debts owed to the state. Bayou State attempts to overcome this constraint by arguing that taxes are not ordinarily considered to be "debts" and that no tax debt has yet arisen in favor of the State because the trial court judgment is not yet definitive. Parenthetically, we note that Bayou State's appeal was not suspensive, but devolutive.
In State ex rel. Huggett v. Montgomery, supra, the court acknowledged that taxes were not ordinarily considered as debts, but as contributions required of the citizens for the support of the government. The court also noted that real estate taxes did not then [in the 1930's] create personal liability, but only a tax lien operating strictly in rem. The court continued:
Nevertheless, it appears to us that the framers of the Constitution used the words "debts" and "obligations," however loosely, as comprehending taxes, because we find in the concluding part of section 13 of article 4 of the Constitution [now Sec. 15 of Art. 7] the proviso that "the heirs to confiscated property may be released from all taxes due thereon at the date of its reversion to them." It appears, therefore, that the constitutional provision relative to debts and obligations was intended to include taxes. 167 So. at 153. (Our brackets.)
In Succession of Popp, supra, the court said:
... a tax which has been actually levied or imposed upon a person or property is a debt of that person or property.... In other words the levy of a tax creates an indebtedness. This inheritance tax is imposed in advance upon all inheritances, and therefore it strikes and fastens to them the instant they come into existence.... [T]his tax had actually long been levied or imposed upon the succession of Mrs. Popp [who died in 1910] when the act of 1912 [reducing the inheritance tax rate] was adopted.... This tax was a debt, ... and, it being such, the Legislature was powerless in 1912 to "release or extinguish" it "in whole or in part." The tax must therefore be computed at [the higher rate in effect in 1910]. 83 So. at p. 767.
Bayou State contends Huggett and Popp are not controlling or persuasive in this case because the procedure for the creation and collection of state taxes was *1111 changed by Act 265 of 1940. We agree that that Act established uniform procedures for the administration and collection of state taxes, some of which had previously been administered and collected by sheriffs or other local public officials. We do not, however, find that the 1940 legislation changed the law with respect to when a tax debt is created. Section 3 of the act provided:

The liability of any taxpayer arising from any fees, interest and penalties, or any of them, imposed by any State tax law, from the time they are due, shall be a personal debt of the taxpayer to the State, recoverable in any court of competent jurisdiction in an action at law in the name of the State. Such debt, whether sued upon or not, shall be a lien on all the property of the debtor ... (Our emphasis.)
The quoted provision was and is consistent with the Popp analysis of when a tax debt becomes "due."
The levy of a severance tax on oil has long been constitutionally authorized. See LSA-Const. Art. 7, § 4, and LSA-Const. 1921, Art. 10, § 21. The present severance tax is statutorily imposed in LRS 47:631.
Severance taxes "shall be paid by the owner ... at the time of severance and become due and exigible monthly ..." § 632. Before 1958, severance tax was due quarterly. See Historical and Statutory Notes following § 632.
Severance tax has always been levied on the owner at the time of severance. See, e.g., Act 145 of 1940, passed the same year as Act 265, which revised the procedure for collecting state taxes, and Act 140 of 1922. Both of these acts levied the tax on the owner at the time of severance and made the tax "due and exigible quarterly." Except for the change from quarterly to monthly payment, the statutory provision that severance tax applies at the time of severance and is payable or due within a relatively short period after severance has not changed since the revision of the procedures for tax collection in 1940.
Bayou State contends that under the present procedure for collection of taxes, found in LRS 47:1561 et seq., a tax debt is not created until there is a final assessment or a final and definitive judgment that is executory. We cannot agree.
The finality of the assessment or judgment recognizing a tax debt is a prerequisite to the creditor's execution of the assessment or the judgment by, for instance, the seizure of the debtor's property, but is not a prerequisite to the creation of the debt. That the debt or obligation exists before the assessment or judgment becomes final is made clear by § 1561, which allows the tax debtor to pay taxes under protest unless "a suit involving the same tax obligation is pending against him" and allows the tax collector who has initiated proceedings under the assessment and distraint procedure to thereafter use summary or ordinary court proceedings "for the enforcement of the same tax obligation." (Our emphasis.)
LRS 47:635 also provides that severance tax is payable monthly and that a taxpayer not complying with the provisions of § 635 "shall be considered delinquent and shall be subject to penalties and interest as provided in R.S. 47:1601 and 1602." Interest at the rate of 1.25 percent per month is computed "from the due date until the tax is paid." § 1601.
In the 1990 judgment, Bayou State was cast for over $1.7 million in statutory interest, computed from the monthly due dates of the severance tax payments owed for 31 months of the 34-month period that began in September 1978. § 1601. Bayou State does not specifically complain about the computation of the judgment.
Bayou State does not otherwise suggest that the date when the judgment becomes definitive is the "due date" of the taxes for purposes of calculating interest. Under these circumstances, it would be illogical and incongruous for us to find, on the one hand for purposes of calculating statutory interest, that the tax debts arose roughly ten years before the trial court judgment was rendered, while on the other hand, finding, for purposes of applying the constitutional prohibition against the legislature's *1112 release of a debt, liability or obligation owed to the state, that the tax debts do not arise until the judgment becomes definitive.
From the current statutes, we reach the logical and reasonable conclusion that the tax obligation arises when the tax becomes due under the statute levying the tax, notwithstanding that the creditor cannot then seize the debtor's property to enforce the obligation. The present law is thus consistent with "prior" law, as stated in Succession of Popp, supra, and has not been "completely changed," since Popp, as Bayou State argues. We also note other analogous authority:
In Fontenot v. Hurwitz-Mintz Furniture Co., 7 So.2d 712 (La.1942), the court reviewed the legislature's repeal in 1940 of a one percent sales tax which the state and the city of New Orleans were authorized to collect by a statute and a city ordinance passed in 1938. The repealing act contained a "savings clause" allowing the state to collect taxes that had accrued before the effective date of the repeal. The savings clause did not mention collection of accrued taxes by the city. The taxpayer argued unsuccessfully that the city sales tax had abated because the city was not mentioned in the savings clause. The court found that this construction of the repealing act would be unconstitutional because the city taxes had become due before the city ordinance that imposed the tax was repealed, and the legislature could not release the taxpayer's obligation for those taxes without violating Art. 4, § 13 of the 1921 constitution.
State v. Grosjean, 161 So. 871 (La.1935), should be compared. There, the suspension of a portion of an occupational tax that was "to be paid and collected quarterly" withstood challenge under Art. 4, § 13 of the 1921 constitution because the tax was suspended about a month before the end of the first quarter, the time when it would have been due.
Bayou State contends Act 313 of 1990 did not change the rate of tax on stripper well production, but "merely clarified the administrative procedure for determining the amount of the tax" by stating that all wells initially determined to be stripper wells prior to the effective date of the act [July 8, 1990] retained their stripper status until they actually produced an average of more than ten barrels of oil per day during an entire calendar month.
Act 313, even if clear, and if here enforced, would have the practical effect of releasing taxpayers in the posture of Bayou State from liability for the difference between the stripper-well tax rate (3.125 percent of value) and the tax rate applicable to fully capable wells (12.5 percent of value). The statutory liability for the additional taxes by a taxpayer who did not timely certify monthly production from the wells was consistently recognized in Davenport, Texas Gas and Scurlock Oil, all cited and discussed supra, notwithstanding that the actual production from the wells during the tax periods in question was assumed to be, or was in fact, stripper-well production.
We assume arguendo, as Bayou State argues, the legislature's apparent displeasure with the Davenport, Texas Gas and Scurlock Oil decisions, and acknowledge the legislature's stated intent "to clarify and confirm proper legislative intent of the existing statutes" by applying Act 313 of 1990 "retroactively to all stripper wells certified prior to the effective date of this Act."
We nevertheless must find that the legislature is prohibited by LSA-Const. Art. 7, § 15 from releasing, in 1990, Bayou State's liability for severance taxes that became due to the state in 1978-1981.
The constitutional prohibition applies even in the face of the legislature's clear intention to benefit an economically distressed class of taxpayers, whether the depressed property owners of the 1930's in State v. Grace, supra, or the depressed oil producers of the 1980's.
See also the discussion of the respective roles of the courts and the legislature in interpreting the state constitution and statutes in State Licensing Bd. for Con. v. State Civil Serv. Com'n, 240 La. 331, 123 *1113 So.2d 76 (1960); Smith v. Division of Administration, 362 So.2d 1101 (La.1978); and Terrebonne v. South Lafourche Tidal Control, 445 So.2d 1221 (La.1984).

DECREE
At Bayou State's cost, the judgment is AFFIRMED.
SEXTON, J., dissents with written reasons.
BROWN, J., joins Judge SEXTON'S dissent with additional reasons.
SEXTON, Judge, dissenting.
There can be no question that the critical language relied on by the Department in Davenport Production Corporation v. Secretary of State, 490 So.2d 1140 (La. App.2d Cir.1986), is dicta. The Davenport taxpayer had never obtained stripper well certification. Further, I am convinced the court in Secretary of Department of Revenue v. Texas Gas Exploration, 506 So.2d 528 (La.App. 1st Cir.1987), made no independent analysis of the statutes at issue and simply followed Davenport.
In short, I find no justification, either statutory or otherwise, for the revenue department's contention that the 0-3 form is sacrosanct. The statutory scheme in existence at the pertinent time involved in the instant case did not contemplate certification each month of production. This taxpayer filed monthly reports (0-1d and 0-1s) each month and regularly paid the appropriate tax. There is virtually no information contained on the 0-3 form that is not contained on the other two forms.
Importantly, we must bear in mind that the penalty for failure to file reports under this statutoy scheme is set out in LSA-R.S. 47:635 and is simply the interest and penalties called for in LSA-R.S. 47:1601 if the taxpayer underpays.
BROWN, Judge, dissenting.
Louisiana's Constitution authorizes a tax upon all natural resources severed from its soil or water. LSA-Const. Art. 7, § 4. A severance tax has been levied by the legislature in response to this constitutional authorization. LSA-R.S. 47:631 et seq. The tax on oil is calculated at 12.5% of its value at the time and place of severance. Recognizing that an increased tax burden on marginal wells would be counterproductive, the legislature provided a lower tax rate for low volume or incapable wells. If a well is certified by the Collector of Revenue as a stripper well, it is taxed at a rate of 3.125% of value. A stripper well is defined as an oil well that is incapable of producing more than ten barrels of oil per day.
The facts in this case are not in dispute. Commencing in 1975, Bayou's crude oil coordinator, Ed Hiendlmayr, obtained certification from the Collector of Revenue for the wells at issue as stripper wells by filing Form 0-10 and Commissioner of Conservation Form DM1R.
Each month thereafter, Hiendlmayr filed Forms 0-1d, 0-1s and 0-3 until he left Bayou in 1979. As a result of these filings by Hiendlmayr, Bayou paid a 3.125% stripper well severance tax. Wayne Taylor succeeded Hiendlmayr as crude oil coordinator. At this time, the Form 0-3 filings ceased because Hiendlmayr left no instructions that they be continued. At all times, however, Forms 0-1d and 0-1s which report production by lease on a monthly basis, were timely filed and severance taxes were paid at the stripper well rate of 3.125%.
In 1981, the Department notified Bayou that Form 0-3 was required to be filed monthly and sought payment of severance taxes calculated at the full rate of 12.5% for those months in which Form 0-3 was not filed. In November 1981, Bayou had the wells re-certified by the Collector of Revenue as stripper wells by again filing Form 0-10 and Conservation Form DM1R. Bayou thereafter filed Forms 0-1d, 0-1s and 0-3 on a timely monthly basis and continued to pay the severance tax rate imposed on stripper wells.
The only constitutionally permissible tax directly levied upon natural resources is a severance tax. Pursuant to and within these constitutional limitations, the legislature provided for such a tax on the severance *1114 of natural resources. To accommodate, not to supersede, this legislative mandate, the Collector of Revenue devised certain forms for the certification and reporting of production from these stripper wells. These were:
0-10 Form 0-10 is used to apply for certification of a well considered to be incapable of producing more than 10 barrels of oil per day. This form identifies the well by producer's name, lease and well name, well serial number, production information, production month and status of other wells on the lease. This form must be accompanied by a Conservation Form DM1R which supports the production information and status of other wells on the lease. If the application is approved, a certification number is assigned to the well.
0-1s This is a form on which the 0-1d's are summarized to show the amount of tax and interest owed by parish which is totaled and a check attached thereto. This form is primarily used as a summary and as an expedient way of processing money and having it deposited.
0-1d This is a severance tax form which is used to report tax lability for crude oil and condensate and this report is by field name, producer name, lease name and purchaser name. This form allows reporting by lease as to taxable period, tax rate, volume and barrels and value by lease and applicable tax.
0-3 Upon approval of the 0-10, Form 0-3 is filed monthly as a means of reporting information for the continued monitoring of the certified wells. This form requires reporting by field name, producer name, lease and well name, certification code, conservation well serial number, production and disposition by well and by taxable period. This is the only form which gives production by well.
Bayou did file Conservation Form DM1R and Form 0-10 to obtain the certification of the wells in question as stripper wells from the Collector of Revenue. After receiving certification Bayou filed 0-1d, 0-1s and 0-3 forms up to 1979. From September 1979 through June 1981 Bayou filed Forms 0-1d and 01s but not 0-3. During this period, Bayou paid severance taxes at the stripper well rate.
The law as contained in LSA-R.S. 47:633(7)(c) requires that the Commissioner of Conservation classify a well as an oil well and the Collector of Revenue determine that it is incapable of producing more than ten barrels of oil per day. It is admitted by the Department that the Commissioner of Conservation did classify the wells in question as oil wells and that the Collector of Revenue did determine and certify that they were incapable of producing more than ten barrels of oil per day. Therefore the wells in question did meet the test as stripper wells for severance tax purposes.
LSA-R.S. 47:633(7)(c) requires only the initial certification and once certified, the taxpayer is entitled to the lower stripper rate as long as the well continues to produce ten barrels or less oil per day. This view is supported by an analysis of the entire statutory scheme. LSA-R.S. 47:642 specifically provides the remedy for a failure to file the severance tax reports required by the Collector of Revenue. At the time of this case, 1979-1981, Article 642 provided that the collector "shall examine the books, records and files ... to ascertain the amount and value of such production and to compute the tax thereon...." In this case Bayou's Forms 0-1d and 0-1s sufficiently justified the payment of the stripper well rate. The Department does not suggest that any audit would have ascertained that the wells in question were not legitimately stripper wells.
This interpretation is further supported by the Legislature's enactments of Acts 313 and 551 of 1990. Addressing the issue directly involved in this case, the Legislature in both acts amended LSA-R.S. 47:633(7)(c)(i) to read:
Once a well has been certified to and determined by the secretary to be incapable of producing an average of more than ten barrels of oil per producing day during an entire month, such stripper well shall remain certified as a stripper well *1115 until the well produces an average of more than ten barrels of oil per day during an entire calendar month.

(emphasis added)
The first act passed in 1990 was Act No. 313 and it specifically provided:
The provisions of this act are hereby declared to be remedial in nature and are intended to clarify and confirm proper legislative intent of the existing statutes and shall be applied retroactively to all stripper wells certified prior to the effective date of this Act. (emphasis added)
This is not a case where the severance tax was underpaid. Pursuant to the legislative act, Bayou State obtained the necessary initial certification and thereafter filed competent forms to support their payment each month of the stripper tax rate. The majority opinion has elevated a bureaucratic form, specifically 0-3, to the level of a legislative act.
If these wells had produced more than ten barrels of oil per day the forms actually filed were adequate to cause an audit. In this case an audit showed that the wells in question never produced more than ten barrels per day. It is inequitable and violates clear legislative intent to impose the equivalent of a three million dollar penalty on a company that paid the taxes it actually owed.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and SEXTON, NORRIS, HIGHTOWER and BROWN, JJ.
Rehearing denied.
NOTES
[1] A 1987 amendment to § 633 changed the definition of a stripper well from "[a] well [that] is incapable of producing more than ten barrels of oil per day" to one that is "incapable of producing an average of more than ten barrels of oil per producing day during the entire taxable month." Neither Bayou State nor the State suggests that the reference to "the entire taxable month" in the 1987 amendment affects this appeal.
[*] Editor's note: Addendum omitted by the court for purposes of publication.