|,BROWN, C.J.
In 1991, the Louisiana Legislature authorized the local governing authorities where riverboats were berthed to levy an admission fee of up to $2.50 for each boarder.[1] In 1993, this legislation was amended to specifically direct how the proceeds collected would be distributed.[2] The parties designated to receive these tax funds from the two Bossier boats were: 80% to the City of Bossier City; 15% to the Bossier Parish School Board for its Bossier Education Excellence Fund (BEEF), and 5% to the Johnny Gray Jones Youth Shelter, which is operated by the Bossier Parish Police Jury. In 1995, this legislation was again amended to add another $.50 to the boarding fee, with this additional amount to go to the Bossier Parish Police Jury for widening Airline Drive and thereafter to be placed in its road fund.[3]
In 1994, disregarding the legislature’s specific authorization, Bossier City entered into contracts with the two gambling boats, Riverboat Gaming Partnership d/b/a Isle of Capri Casino-Bossier City (“Isle of Capri”) and Horseshoe Entertainment (“Horseshoe”).[4] These contracts set an annual fee for each boat that gave the City 3.2% of gross receipts (or a minimum of $2.5 million), $350,000 to the Police Jury *146 (of which $50,000 would go to the Youth Shelter), $300,000 to the School Board, $200,000 to the Sheriff of Bossier Parish and $150,000 to the Greater Bossier Economic | gFoundation.[5] The record reflects that 3.2% of gross revenues have always been greater than the $2.5 million minimum payable to Bossier City and that the Boats’ revenues have consistently increased. Thus, while the School Board, Police Jury, and Shelter have received the same money each year, the City’s revenues have continually grown. See Horseshoe Entertainment v. Bossier Parish Police Jury, 30,502 (La.App.2d Cir.06/26/98), 714 So.2d 920, writ denied, 98-1941 (La.11/06/98), 728 So.2d 392.
Plaintiffs, a group of concerned citizens from Bossier Parish[6], challenged the revenue contracts entered into between “Isle of Capri”, “Horseshoe” and Bossier City. Also made defendants were the other parties to the contracts, the Bossier Parish Sheriffs Office, the Bossier Parish Police Jury, the Bossier Parish School Board, the Greater Bossier Economic Development Foundation, and Johnny Gray Jones Youth Shelter.
After a bench trial, it was ruled that the provision in the contracts that attempted to restrict Bossier City’s authority to assess a boarding fee or any other tax authorized by the legislature was unenforceable as being against public policy; however, the trial court recognized the severability of that provision. The trial court further found that the enactment in 2003 of an amendment to La. R.S. 27:93 retroactively ratified the method of collection |sand distribution detailed in the contracts. Accordingly, the trial court refused to redistribute the proceeds actually collected to the parties designated by the legislature to receive those funds. From this ruling, plaintiffs have appealed. We reverse, render, and remand.

Discussion

Validity of Casino Revenue Contracts

In its written opinion, the trial court recognized that “[A] strong argument can be made that unless the legislature approves or ratifies the practice, a government entity can do nothing other than collect and distribute revenue as spelled out by statute and is not free to negotiate and contract inconsistent therewith.” Clearly, in this case, defendants negotiated and contracted inconsistent with the method of collection and distribution spelled out by the statute. The contracts imposed a tax not authorized and a distribution of those funds contrary to what was designated.
La. Const, art. VII, § 1(A) states, “[E]xeept as otherwise provided by this constitution, the power of taxation shall be vested in the legislature, shall never be surrendered, suspended, or contracted away, and shall be exercised for public purposes only.” This court previously reviewed the contracts at issue in Horseshoe Entertainment v. Bossier Parish Police Jury, supra at 924, and observed:
*147 A municipality or police jury is a subordinate political subdivision of the state and as such possesses only those powers delegated to it by the state and its constitution. Rollins Environmental Services of Louisiana, Inc. v. Iberville Parish Police Jury, 371 So.2d 1127 (La.1979); Bradford v. City of Shreveport, 305 So.2d 487 (La.1974). The state has the ultimate power to license and regulate gaming facilities. Polk v. Edioards, supra, 626 So.2d 1128 (La.1993). Therefore, it correlates that any political subdivision of |4the state has only such powers as are expressly delegated to it by the state through statutory enactments. See Johnston v. Morehouse Parish Police Jury, 424 So.2d 1053 (La.App. 2d Cir.1982).
The delegation of the legislature’s taxing power must be strictly construed. These contracts represent an attempt to exercise taxing power beyond what was delegated to these political subdivisions by the state. Thus, the 1994 casino revenue contracts, including any extensions thereof, are invalid in their entirety. La. Const, art. VII, § l.[7]

Act 1222 of2003

Although the trial court found that a provision in the casino revenue contracts restricting the power to assess a boarding fee was against public policy, it cited a severability clause in the contracts and Act 1222 of 2003, an amendment to La. R.S. 27:93, to support its refusal to redistribute the collected revenues in accord with the legislature’s instructions. The trial court’s reliance on a severability clause in the contracts, however, is misplaced as we have found that the contracts in their entirety are unconstitutional.
The second part of the trial court’s ruling is likewise misplaced. Plaintiffs argue that the trial court is applying Act 1222 of 2003 retroactively to impair a vested right to challenge the contracts. Defendants, however, argue that the legislature passed Act 1222 of 2003 to interpret La. R.S. 27:93 to allow contracts such as those at issue here.
In McNamara v. Bayou State Oil Corporation, 589 So.2d 1099, 1112 (La.App. 2d Cir.1991), writ denied, 592 So.2d 1335 (La.1992), this court | ..¡addressed a similar argument concerning retroactive and interpretive legislation:
We assume arguendo, as Bayou State argues, the legislature’s apparent displeasure with the Davenport Production Corp. v. Secretary of La., 490 So.2d 1140 (La.App. 2d Cir.1986), Dept. of Revenue v. Texas Gas Exploration, 506 So.2d 528 (La.App. 1st Cir.1987) and McNamara v. Scurlock Oil Co., 545 So.2d 1312 (La.App. 1st Cir.1989) decisions, and acknowledge the legislature’s stated intent ' “to clarify and confirm proper legislative intent of the existing statutes” by applying Act 313 of 1990 “retroactively to all stripper wells certified prior to the effective date of this Act.”
We nevertheless must find that the legislature is prohibited by LSA-Const. Art. 7, § 15 from releasing, in 1990, Bayou State’s liability for severance taxes that became due to the state in 1978-1981.
The constitutional prohibition applies even in the face of the legislature’s clear intention to benefit an economically distressed class of taxpayers, whether the depressed property owners of the 1930’s in State ex rel. Chess & Wymond Co. of La. v. Grace, supra, 188 La. 129, 175 So.825 (1937), or the depressed oil producers of the 1980’s.
*148 Furthermore, this court cannot accept defendants’ argument that this amendment was interpretive, as La. R.S. 27:93 was substantively changed to do something it never did before, that is, to allow for the collection of a fixed sum and percentage of monthly casino revenues instead of a boarding fee and to distribute those funds inconsistent with what the legislature directed.

Redistribution

The trial court correctly noted, “[T]he most important issue is what should be done with the monies that have been collected.”
In his opening remarks to this court, the attorney arguing for all defendants gave a glimpse into the essence of defendants’ position as follows:
IfiThe trial court ... succinctly states how the plaintiffs have, perhaps beyond all reason, succeeded in this litigation and plaintiffs may be surprised to hear that, and I believe its true.... The one thing the plaintiff has not accomplished is a redistribution.[8]
The legislature specifically delineated its intent as to how collected casino revenues were to be distributed. See La. R.S. 4:552 (now La. R.S. 27:93). Although the collection of the boarding fee as set forth by La. R.S. 4:552 (now La. R.S. 27:93) was permissive, the statute is not permissive when dealing with distribution of the fees collected. Accordingly, any distribution beyond the statutory designation was illegal. La. R.S. 4:552 provided a formula for distribution based on the $2.50 boarding fee as follows: 80% to Bossier City, 15% to Bossier Parish School Board for the Bossier Education Excellence Fund (“BEEF”); and 5% to the Johnny Gray Jones Youth Shelter. As noted above, La. R.S. 4:552 was amended in 1995, and re-designated at this time as La. R.S. 27:93. The amendment allowed |7an additional $.50 to be collected for the Bossier Parish Police Jury road fund. Of course, this change is only effective after August 15, 1995, when the statute was amended to include the Bossier Parish Police Jury. The change did not alter the percentages being received by the other entities. It only added an *149 additional $.50 to be received by the Police Jury.
Act 1222 of 2003 took effect on August 15, 2003, and required the collection of four and five-tenths percent of monthly net gaming proceeds. Accordingly, as of that date, the collection and distribution methods shall follow the changes made by the statute. During oral argument, defendants advised this court that the Isle of Capri contract had expired, and that the Isle of Capri is now paying in accordance with this amendment to the statute. However, as noted infra, Horseshoe obtained an extension on its contract through 2007, and continues to pay pursuant to that agreement. As this contract (and extension) is illegal, Horseshoe should have followed and must now comport with the statute by paying four and five-tenths percent of monthly net gaming proceeds.
Bossier City was charged with the collection and distribution of the casino revenues, and they failed to properly pay the Bossier Parish Police Jury, the Bossier Parish School Board, and the Johnny Gray Jones Youth Shelter, while improperly making payments to the Bossier Parish Sheriffs Office and the Greater Bossier Economic Development Foundation. The trial court is directed to determine the amount owed by Bossier City to the Bossier Parish Police Jury, the Bossier Parish School Board, and Johnny Gray Jones Youth Shelter. Further, the trial court is directed to determine jswhat amounts are to be reimbursed to the City by the Sheriffs Office and the Greater Bossier Economic Development Foundation. We remand for the trial court to determine the sums due in accordance with these instructions.

Conclusion

We reverse the trial court and render judgment in favor of plaintiffs and remand for the trial court to redistribute the monies collected in accordance with the instructions herein. Further, the trial court should decide the merits of plaintiffs’ request for an award of attorney-fees. Costs of all proceedings are assessed against defendant Riverboats, the Isle of Capri and Horseshoe.
REVERSED, RENDERED, and REMANDED.

. The Riverboat Economic Development and Gaming Control Act, Acts 1991, No. 753 [La. R.S. 4:501-562; La. R.S. 14:90],

. Acts 1993, No. 405.

. Acts 1995, No. 743.

. There are two separate contracts involved, one for each casino.

. In the contract, the School Board's money was not designated to go into BEEF. The Sheriff and Foundation were not designated by the legislature to receive any distribution. Note: The Greater Bossier Economic Development Foundation is an arm of the Bossier Chamber of Commerce, a private entity which is free to participate in partisan politics. We note that the power of taxation can be exercised for public purposes only. La. Const, art. VII, § 1(A). The funds to the Foundation are not designated for any specific purpose.

. Plaintiffs are Billy Brooks Hudson, Marguerite Hudson, W.C. Kostelka, and Gary Dowden. Both Kostelka and Marguerite Hudson are members of the Bossier Parish School Board.

. In 1997, the Horseshoe contract was extended until the year 2007.

. Litigation regarding the validity of these casino contracts dates back to 1995, when the Bossier Parish Police Jury attempted to pass the authorized $.50 increase. In that suit, this court initially noted the illegality of the casino contracts, which thereafter prompted suit by the Bossier Parish School Board against the City of Bossier, Isle of Capri and Horseshoe. The school board filed a motion for summary judgment, which was denied by the trial court. Thereafter, the school board passed a resolution to stop all further litigation regarding the contracts. The action was then re-filed, by the same attorneys who previously represented the school board, on behalf of the current plaintiffs. This prompted the school board to file a motion to disqualify those attorneys, due to a conflict of interest. The motion was granted and writs were denied. A new attorney was enrolled for plaintiffs. Most of the defendants then filed a motion of res judicata. (The school board and police jury, although defendants, did not join in this motion). The motion was granted by the trial court, but overturned by this court on appeal, and writs to the Supreme Court were denied. See Hudson v. City of Bossier, 33,620 (La.App.2d Cir.08/25/00), 766 So.2d 738, writ denied, 00-2687 (La.11/27/00), 775 So.2d 450. Defendants then filed an exception of no right of action, which was granted by the trial court. (The police jury did not join in the exception). This court overturned that ruling, noting that concerned citizens of a municipality have a right of action when the municipality causes a burden on the public fisc. The Supreme Court denied writs. Hudson v. City of Bossier, 36,213 (La.App.2d Cir.08/14/02), 823 So.2d 1085, writ denied, 02-2383 (La. 11/27/02), 831 So.2d 279. Defendants then sought legislative approval of what they had done. Act 1222 of 2003 was passed in an attempt to ratify their actions.