930 So.2d 881 (2006)
Billy Brooks HUDSON
v.
CITY OF BOSSIER CITY, et al.
Nos. 2005-C-0351, 2005-C-0352.
Supreme Court of Louisiana.
April 17, 2006.
*883 Baker, Donelson, Bearman, Caldwell & Berkowitz, Donna D. Fraiche, Aubrey B. Hirsch, Jr., Jennifer B. McNamara, Steven F. Griffith, Jr., New Orleans, Lemle & Kelleher, T. Haller Jackson, III, Joseph L. Shea, Kathryn S. Bloomfield, Robert W. Kyle, Shreveport, Wiener, Weiss & Madison, Susie Morgan, Michael Allyn Stroud, Shreveport, John Schuyler Marvin, District Attorney, James D. Hall, City Attorney, Patrick R. Jackson, Parish Attorney, for applicant.
Hammonds & Sills, Robert L. Hammonds, Jon K. Guice, Karen D. Murphy, Baton Rouge, Cook, Yancey, King & Galloway, Mary D. Bicknell, Edwin L. Blewer, Jr., Glenn L. Langley, Shreveport, Lunn, Irion, Salley, Carlisle & Gardner, Penny N. Nowell, Charles W. Salley, Jeffrey L. Little, Shreveport, Klotz, Simmons & Brainard, David Klotz, Shreveport, Booth, Lockard, Politz, Lesage, Hayter & Odom, Bennett L. Politz, Shreveport, Theodore E. Johnson, Jr., for respondent.
CALOGERO, Chief Justice.
We are called upon in this case to decide the validity of two ten-year casino revenue agreements entered in 1994 by the defendant, City of Bossier City ("Bossier City"), one with each of two other defendants in this lawsuit, companies that operate riverboat casinos within the territorial jurisdiction of Bossier Citynamely Louisiana River Gaming Partnership, d/b/a Isle of Capri Casino ("Capri"), and Horseshoe Entertainment ("Horseshoe"). The district court found that the casino revenue agreements were valid, except for one provision, which the district court found was severable. The court of appeal reversed, found the agreements were invalid in their entirety, ordered redistribution of the monies collected under the agreements, and remanded to the district court to determine sums due. We granted the defendants' applications for supervisory writs to determine the validity of the agreements. Following our review of the facts and applicable legal principles, we find that the agreements are valid, except for the severable provision that was invalidated by the district court. Accordingly, we reverse the court of appeal judgment and reinstate the judgment of the district court, finding as we do that the casino revenue agreements are valid.

FACTS AND PROCEDURAL HISTORY
La. Const. art. 12, § 6(b) provides that "[g]ambling shall be defined by and suppressed by the legislature." Pursuant to its exclusive authority to define and suppress gambling in the State of Louisiana, the Louisiana Legislature in 1991 enacted the Louisiana Economic Development and Gaming Control Act, originally found at Chapter 9, Title 4 of the Louisiana Revised Statutes. See 1991 La. Act. 753, § 1.[1] One provision of the Act, La.Rev.Stat. 4:552(A), authorized, but did not require, local governing *884 authorities in jurisdictions where gaming riverboats were berthed to levy an admission fee of $2.50 per person.[2] La. Rev.Stat. 4:552. La.Rev.Stat. 4:552(B) at that time provided as follows:
B. Other than to levy the admission fee authorized by Subsection A of this Section, no local governing authority may license or regulate the operation of riverboats and the gaming operations conducted thereon.
In 1993, La.Rev.Stat. 4:552(A) was amended to provide the means of allocating monies collected as admission fees by local governing authorities, pursuant to the statute.[3] 1993 La. Acts. 405. The amendment required that any funds derived from admission fees levied by Bossier Parish be allocated 80 percent to Bossier City, 5 percent to the Johnny Gray Youth Shelter, and 15 percent to the Bossier Parish School Board to be used solely for the Bossier Educational Excellence Endowment Fund ("BEEF").
In April 1994, Bossier City entered into the two casino revenue agreements with Capri and Horseshoe that are the subject of this litigation. The preambles to the two agreements, which are virtually identical except for the name of the casino involved, stated as follows:
WHEREAS, the Louisiana Legislature has authorized the City of Bossier City to levy a boarding fee of $2.50 per passenger; and
WHEREAS, the Louisiana Legislature has further provided that fifty cents ($.50) of the $2.50 boarding fee shall be distributed among certain designated entities in Bossier Parish; and
WHEREAS, the Louisiana legislature will continue to receive requests for funding from gaming revenues in the future unless all of the major governmental entities and agencies in Bossier Parish agree on a distribution of gaming revenues; and
WHEREAS, it is in the best interest of [the casino], the City of Bossier City, Bossier Parish Police Jury, Bossier Parish School Board, Bossier Parish Sheriff, the Bossier Parish Police Jury on behalf of the Johnny Gray Jones Youth Shelter and the Greater Bossier Economic Development Foundation to reach an agreement regarding the distribution of gaming revenues, in lieu of levying a boarding fee, so that gaming revenues may be distributed and budgeted without further legislative intervention; and
WHEREAS, all governmental entities and agencies which are beneficiaries of gaming revenues will execute appropriate resolutions in conjunction with this agreement requesting the Louisiana Legislature to exempt Bossier City, Bossier *885 Parish, from any future modifications to riverboat gaming legislation regarding the assessment or distribution of fees; and
WHEREAS, all governmental entities and agencies agree to accept the distributions of riverboat gaming revenue set forth herein in lieu of any future legislative modifications which may be proposed regarding distributions of riverboat gaming revenue.
(Emphasis added.)
The two agreements then set forth a "Distribution of Gaming Revenues," which provided that Bossier City would receive $2.5 million per year or 3.2 percent of the gross gaming receipts, whichever was greater. The agreements further provided that the casinos would pay Bossier City an additional $1 million per year "on behalf of the other governing authorities." The City was required under the agreements to distribute the $1 million as follows: (1) $300,000 to the Bossier Parish School Board; (2) $300,000 to the Bossier Parish Police Jury; (3) $200,000 to the Bossier Parish Sheriff's Department; (4) $150,000 to the Greater Bossier Economic Development Foundation ("GBEDF");[4] and (5) $50,000 to the Bossier Parish Police Jury, on behalf of the Johnny Gray Jones Youth Shelter. The casinos were required by the agreements to remit the additional $1 million on a pro-rated monthly basis over a twelve-month period.
Section 1.5 of the agreements further stated as follows:
Under the Agreement herein, the payments made under this Agreement are acknowledged to be in total fulfillment of [the casino's] obligation under [La.Rev. Stat. 4:552], particularly to the Johnny Gray Jones Youth Center and the Parish of Bossier to the Bossier Parish School Board, with distribution by the CITY, also the Bossier Parish Police Jury, Sheriff of Bossier Parish, Bossier Parish School Board General Fund, and the Bossier Economic Development Foundation.
This provision is commonly called a "no-levy" clause.
Finally, section 13 of the agreements provided as follows:
If any provision of this Agreement is held to be invalid, illegal, or unenforceable, that shall not affect or impair, in any way, the validity, legality, or enforceability of the remainder of this Agreement.
By 1995 La. Act. 743, La.Rev.Stat. 4:552[5] was further amended to increase the admission fee per person that Bossier *886 parish was authorized to levy from $2.50 to $3. La.Rev.Stat. 4:552(B)(2)(I) was also added to require that, in the event Bossier Parish chose to levy the additional 50 cents admission fee, the funds derived from that fee "be used in their entirety" for the parish road fund, first to make Airline Drive from 1-220 to the Linton Road Cutoff into a four-lane highway, following which the fees would be used "for general use in the parish road fund."
In 1996, the Louisiana Legislature by 1996 La. Act 7 enacted section 3 of Title 27 to the Louisiana Revised Statutes of 1950, comprised of Chapter 1, Rev. Stats. 27:1 to 27:3, Chapter 2, Rev. Stats. 27:11 to 27:26, and Chapter 3, Rev. Stats. 27:31 and 27:32. As part of that Act, Title 4 of the Louisiana Revised Statutes of 1950, the Louisiana Riverboat Economic Development and Gaming Control Act, was redesignated Chapter 4 of Title 27, consisting of La. Rev. Stats. 27:41 to 27:113. Pertinent to the controversy herein, La.Rev.Stat. 4:552, which authorized local government authorities to levy the admission fee, was redesignated as La.Rev.Stat. 27:93.
Effective January 1, 1997, Horseshoe reached a separate agreement with the Bossier Parish Police Jury to pay monies directly to that local governmental authority. As a result, the agreement between Bossier City and Horseshoe was amended primarily for the purpose of removing the Bossier Parish Police Jury from the distribution of monies being paid by Horseshoe to Bossier City on behalf of the other governmental entities. However, another result of the amendment was that the agreement between Bossier City and Horseshoe was extended until ten years from the date of execution of the amendment, or until January 1, 2007.
The final pertinent amendment to the statute authorizing local governing authorities to levy an admission fee on riverboats was made by 2003 La. Acts 1222, which reenacted and amended La.Rev.Stat. 27:93,[6]inter alia, "to provide for the
*887 allocation of funds derived from riverboat admission fees on certain riverboats in Bossier Parish." Following the 2003 amendments, Bossier City was, for the first time, required (as opposed to simply authorized) to levy an admission fee equal to 4.5 percent of the monthly net gaming proceeds from each riverboat. Bossier City was further required by the amended statute to allocate the admission fee as follows: 2.95 percent to Bossier City, 0.63 percent to the parish road fund for four-laning Airline Drive, then for general use in the parish road fund; 0.56 percent to the BEEF, as provided for in La.Rev.Stat. 17:408.2; 0.20 percent to the Bossier Parish Sheriff's Office; 0.04 percent to the Johnny Gray Jones Youth Shelter; 0.12 percent to the GBEDF. La.Rev.Stat. 27:93(B) was further amended to provide as follows:
Other than to levy the admission fee, or the assessment of the monthly net gaming proceeds by the governing authority of Bossier City in Bossier Parish, authorized by Subsection A of this Section, no local governing authority may license or regulate the operation of riverboats and the gaming operations conducted thereon.
(2003 changes boldfaced.) Finally, section 2 of 2003 La. Acts 1222 added the following Note to La.Rev.Stat. 27:93:
Section 2. Nothing contained in the provisions of this Act shall operate to impair the obligation of any contract previously executed by the city of Bossier City and/or the Bossier Police Jury *888 which is in effect on the effective date of this Act.
The validity of the casino revenue agreements has been challenged in two previous lawsuits, the first filed by the casinos against the Bossier Parish Police Jury and the second filed by the Bossier Parish School Board against the casinos and Bossier City. The two different district judges in the 26th Judicial District Court, Parish of Bossier, to whom the cases were assigned reached different conclusions on the validity of the agreements. See, Hudson v. City of Bossier, 33,620, pp. 4-5 (La.App. 2 Cir. 8/25/00), 766 So.2d 738, 741-42, writ denied, 02-2383 (La.11/27/02), 831 So.2d 279 [hereinafter referred to as "Hudson I"] (which describes the two previous cases).
In the case filed against the Bossier Parish Police Jury, the casinos sued to restrain and enjoin enforcement of an admission fee levied by the police jury after the 1995 amendment authorized the local governing authority in the jurisdiction in which the riverboats were berthed to levy an additional $.50 admission fee to be used in the parish road fund. Horseshoe Entertainment v. Bossier Parish Police Jury, 30,502 (La.App. 2 Cir. 06/26/98), 714 So.2d 920, writ denied, 98-1941 (La.11/06/98), 728 So.2d 392. The casinos argued in Hudson I that the Bossier Parish Police Jury had "contracted away" its right to levy the additional admission fee by virtue of its participation in the casino revenue agreements at issue herein. Id. The court of appeal affirmed the district court's finding that the local governing authorities could not contract away their right to collect the admission fee authorized by the legislature and found therefore that Section 1.5 of the agreements, which restricted the right of the local governing authorities to levy an admission fee, was contrary to public policy and invalid. Id. at 8, 714 So.2d at 925. However, the court of appeal also found that Bossier City was the only local governing authority authorized by the statute to levy the admission fee, and thus that the Bossier Parish Police Jury did not have the authority to levy the admission fee. Id. Accordingly, the court of appeal reversed the district court's judgment to the extent it found that the police jury had the authority to levy the additional $.50 admission fee.
In the second of the two previous cases that challenged the validity of the casino revenue agreements, the Bossier Parish School Board filed suit in August of 1997, seeking to have the casino revenue agreements declared null and void. See Hudson v. City of Bossier, 36,213, p. 2(La.App. 2 Cir. 8/14/02), 823 So.2d 1085, 1087 (Hudson II). "However, the school board abandoned its position in pleadings which resulted in the granting of the defendant's summary judgment motion that recognized the validity of the agreement, a judgment that the School Board did not appeal." Id.
The plaintiffs herein, a group of concerned Bossier Parish taxpayers, including at least two former Bossier Parish School Board members, filed this "Class Action Suit to Hold Contracts Invalid" on June 11, 1998.[7] Named as defendants were Bossier City, Bossier Parish Police Jury, Bossier Parish Sheriff's Department, GBEDF, Bossier Parish School Board, The Johnny Gray Jones Youth Shelter, Capri, and Horseshoe. The plaintiffs alleged that La.Rev.Stat. 27:93 (formerly 4:552), "prescribe[s] . . . the method or system of the governing political entities to raise public revenues from the gaming operations," by granting the governing authorities "the option of charging boarding fees of up to $3.00 per each passenger *889 boarding or embarking on the riverboat or of charging no fees at all." The plaintiffs claim that the casino revenue agreements were entered "[n]otwithstanding this legislative directive," and that "the method adopted by [Bossier City] for raising revenues from the gaming activities is contrary to the intent and spirit of [La.Rev.Stat. 27:93]." Plaintiffs further assert that defendant Bossier City improperly contracted to receive a fixed amount from the casinos, rather than the 80 percent of the funds derived from the admission fee authorized by the statute. Plaintiffs also alleged that defendants Bossier Parish School Board and Johnny Jones Gray Youth Center improperly agreed to accept a percentage of the $1 million annual payment from the casinos, rather than the 15 percent and 5 percent of the admission fee they were entitled to receive under the provisions of the statute. Plaintiffs also claim that defendants Bossier Parish Police Jury, Bossier Parish Sheriff's Department, GBEDF, and Bossier Parish School Board, improperly received percentages of the $1 million paid by the casinos, even though they were not entitled to receive any gaming funds under the statute. According to plaintiffs, the agreements are therefore null and void.
Between the filing of suit and the bench trial in this matter, the district court considered and ruled on numerous exceptions and motions in limine. Two of those rulings were appealed to the Louisiana Second Circuit Court of Appeal. In the first of those rulings, defendants had filed an exception of res judicata based on the School Board's prior suit. The district court granted the defendants' exception of res judicata, but the court of appeal reversed that holding in Hudson I, finding that this case was not barred by res judicata because the plaintiffs' interests were not adequately represented in the School Board litigation. 33,620, 766 So.2d 738 (emphasis added). This court denied writs. Hudson v. City of Bossier, 00-2687 (La.11/27/00), 775 So.2d 450.
On remand to the district court following the court of appeal's reversal of the judgment dismissing the case on defendants' exception of res judicata, the district court ruled on a different pending motion and granted the defendants' exception of no cause of action, finding that the plaintiffs had failed to show that the conduct complained of resulted in an increased tax burden and that the plaintiffs therefore had no standing to challenge the legality of the agreements at issue. Again, the court of appeal reversed, finding that the plaintiffs do have standing to challenge the validity of the agreements because they "have at least a small and indeterminable interest in seeing that their elected representatives obey the laws and not enter into illegal agreements in matters pertaining to the public fisc." Hudson v. City of Bossier, 36,213 (La.App. 2 Cir. 8/14/02), 823 So.2d 1085 (Hudson II). Again, this court denied writs. Hudson v. City of Bossier, 02-2383 (La.11/27/02), 831 So.2d 279.
Following a bench trial on the merits held on April 6, 2004, the district court found that Section 1.5 of the agreements,[8] the "no-levy" clause that restricted Bossier City's authority to assess an admission fee or other tax authorized by the Legislature, *890 was unenforceable as against public policy, but held that that provision was severable from the remainder of the agreements, pursuant to the severability provision found in section 13 of the agreements. The district court otherwise ruled in favor of the defendants, noting that the Louisiana Legislature made specific reference to the agreements in the 2003 La. Acts 1222 amending La.Rev.Stat. 27:93, despite the fact that it was aware of the ongoing dispute regarding the casino revenue agreements. The district court further found that the 2003 amendment to La.Rev.Stat. 27:93 designated the exact same entities to receive the monies collected as admission fees as those designated in the casino revenue agreements, and that the amounts to be received by the various entities under the amendment were similar, though not identical, to the amounts specified in the agreements. Accordingly, the district court found that the Louisiana Legislature ratified the method of collection and distribution that had occurred under the casino revenue agreements prior to the passage of the 2003 amendment to La.Rev. Stat. 27:93.
The court of appeal disagreed, citing La. Const. Art. VII, § 1(A), which provides generally that "the power of taxation shall be vested in the legislature, shall never be surrendered, suspended, or contracted away, and shall be exercised for public purposes only." Hudson v. City of Bossier City, 39,182, p. 3 (La.App. 2 Cir. 1/6/05), 892 So.2d 143, 146 (Hudson III). After noting that the delegation of the legislature's taxing power must be strictly construed, the court of appeal found that the casino revenue agreements were invalid in their entirety because they "imposed a tax not authorized and a distribution of those funds contrary to what was designated." Id. The court of appeal also disagreed with the district court's conclusion that the "no-levy" provision could be severed from the remainder of the agreements, and found that the agreements were invalid in their entirety.
The court of appeal then rejected the district court's conclusion that the 2003 amendment ratified the 1994 agreements, citing McNamara v. Bayou State Oil Corp., 589 So.2d 1099 (La.App. 2 Cir.1991), writ denied, 592 So.2d 1335 (La.1992). Id. According to the court of appeal, the 2003 amendments substantively changed La. Rev.Stat. 27:93, cannot be considered interpretive, and therefore cannot be applied retroactively to validate the casino revenue agreements. Id. at 5, 892 So.2d at 148. The court of appeal ordered that the monies collected be redistributed in compliance with the provisions of La.Rev.Stat. 27:93, as it existed prior to the 2003 amendment, and remanded to the district court to determine the sums due. Id. at 6, 892 So.2d at 149. This court granted and consolidated applications for supervisory writs filed by two groups of defendants. Hudson v. City of Bossier City, 05-0351, 05-0352 (La.4/22/05), 899 So.2d 574.

VALIDITY OF THE CASINO REVENUE AGREEMENTS
One of the primary arguments set forth by relators in brief to this court is that the court of appeal improperly invalidated agreements that had been properly negotiated and executed within the powers reserved to Bossier City under its Home Rule Charter.[9] La. Const. [1974] art. VI, § 5 "includes a complicated set of provisions governing the powers of `local *891 governmental subdivision[s],' a term that covers both parishes and municipalities." Savage v. Prator, 04-2904, p. 5 (La.1/19/06), 921 So.2d 51, 54, quoting Kenneth M. Murchison, Local Government Law, 64 La. L.Rev. 275, 279 (2004). The article provides, in pertinent part, as follows:
(A) Authority to Adopt; Commission. Subject to and not inconsistent with this constitution, any local governmental subdivision may draft, adopt, or amend a home rule charter in accordance with this Section. The governing authority of a local governmental subdivision may appoint a commission to prepare and propose a charter or an alternate charter, or it may call an election to elect such a commission.
* * * * *
(E) Structure and Organization; Powers; Functions. A home rule charter adopted under this Section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution.
(Emphasis added.)
In support of its finding that the casino revenue agreements at issue in this case were invalid, the court of appeal in this case quoted the following language from its previous decision in Horseshoe Entertainment, 30,502, 714 So.2d 920:
A municipality or police jury is a subordinate political subdivision of the state and as such possesses only those powers delegated to it by the state and its constitution. Rollins Environmental Services of Louisiana, Inc. v. Iberville Parish Police Jury, 371 So.2d 1127 (La. 1979); Bradford v. City of Shreveport, 305 So.2d 487 (La.1974). The state has the ultimate power to license and regulate gaming facilities. Polk [v. Edwards, 626 So.2d 1128 (La.1993)]. Therefore, it correlates that any political subdivision of the state has only such powers as are expressly delegated to it by the state through statutory enactments. See Johnston v. Morehouse Parish Police Jury, 424 So.2d 1053 (La. App. 2d Cir.1982).
Id. at p. 7, 714 So.2d at 924.
A review of the cases cited in the quotation above reveals that none of those cases involved municipalities or political subdivisions operating under a valid home rule charter. In fact, since the adoption of the 1974 Louisiana Constitution, La. Const. art. VI, § 6 has prohibited the Louisiana Legislature from enacting any law "the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter." See LaFourche Parish Council v. Autin, 94-0985 (La.12/9/94), 648 So.2d 343, 352. La. Const. art. VI, §§ 5 and 6 "plainly show that a municipality operating under a home rule charter possesses power as broad as that exercised by the State, except where limited by the Constitution, by laws permitted by the Constitution, and the charter itself." City of Shreveport v. Chanse Gas Corp., 34,958, p. 9 (La.App. 2 Cir. 8/22/01), 794 So.2d 962, 970, citing Francis v. Morial, 455 So.2d 1168 (La.1984). Moreover, this court has specifically found that "[a] public entity has wide discretion to contract, provided it receives sufficient consideration, which may include economic return, increased employment and attraction of similar development to the area." Board of Assessors of City of New Orleans v. City of New *892 Orleans, 02-0691, p. 16 (La.App. 4 Cir. 9/25/02), 829 So.2d 501, 509. Accordingly, we find that Bossier City had authority as a local home rule charter government to enter the casino revenue agreements in question.
Plaintiffs argue however that the defendants' arguments regarding Bossier City's authority to enter contracts under its home rule charter are irrelevant because the broad powers granted home rule charter governments by La. Const. art. VI, §§ 5 and 6 are limited by both the Louisiana Constitution and the laws permitted by the Constitution. See Chanse Gas Corp., 34,958 at 9, 794 So.2d at 970. According to plaintiffs, the fact that Bossier City generally has the right to contract does not mean that the casino revenue agreements at issue here are valid. The court of appeal's conclusion that the agreements were invalid is based on three findings: (1) the agreements exceeded the limits imposed by the La. Const. art. III, § 1(A), which vests the power of taxation in the Louisiana Legislature; (2) the agreements exceeded the limits of a law permitted by the Constitution, i.e., La.Rev. Stat. 27:93 (formerly La.Rev.Stat. 4:552), because it provided for distribution of the funds paid pursuant to the agreements differently from that set forth in the statute for allocation of the admission fees; and (3) the agreements are invalid in their entirety because they contain a provision that is void as against public policy. Thus, we must now determine whether the casino revenue agreements are invalid for any one or more of these three reasons expressed by the court of appeal.
Relative to the court of appeal's first reason for invaliding the agreementsi.e., that the agreement exceeds a constitutional limit, La. Const. art. VII, § 1(A) provides as follows:
Except as otherwise provided by this constitution, the power of taxation shall be vested in the legislature, shall never be surrendered, suspended, or contracted away, and shall be exercised for public purposes only.
The court of appeal found that Bossier City's decision to enter the casino revenue agreements at issue in this case violated La. Const. art. VI, § 1(A) because, by virtue of the agreements, Bossier City enacted a tax that had not been authorized by the Legislature. The underlying premise in both the plaintiffs' arguments and the court of appeal's finding is that, when Bossier City and the casinos voluntarily executed the casino revenue agreements, Bossier City somehow had levied an unauthorized "tax" on the casinos.
Blacks Law Dictionary defines "tax," in pertinent part, as follows:
To impose a tax; to enact or declare that a pecuniary contribution shall be made by the persons liable, or the support of government. Spoken of an individual, to be taxed is to be included in an assessment made for purposes of taxation.
A pecuniary burden laid upon individuals, business entities, or property to support and carry on the legitimate functions of the government. Essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority.
Black's Law Dictionary 758 (5th ed.1983) (emphasis added). The payments made by the casinos pursuant to the casino revenue agreements were voluntary, not an enforced contribution, meaning that they lack the "essential characteristics" of a tax.
Further, we disagree with the plaintiffs' argument that this court should find that the agreements impose a tax because they specifically state that the rights and responsibilities outlined therein are "in lieu of" the admission fees authorized by La. *893 Rev.Stat. 4:552 (now La.Rev.Stat. 27:93). Although it may or may not be true that the casino revenue agreements would not have been executed had the Legislature not adopted the statute, as the plaintiffs speculate, that fact does not mean that the casinos' decision to voluntarily contract to pay a fixed amount in lieu of the admission fees can somehow be considered a "tax," especially since the "essential characteristics" of a tax (i.e., taxes are not voluntary payments, but enforced contributions), as set forth in Black's Law Dictionary, are not present. Thus, we find that Bossier City did not exceed the limits of the constitution set forth in La. Const. art. VII, § (1)(A) when it entered the casino revenue agreements because it did not levy an unauthorized tax.
Relative to the court of appeal's second reason for finding that the casino revenue agreements are invalidi.e., that the agreements exceeded the limits of a constitutional law, we note that the defendants in this case concede that the distribution of the funds paid to Bossier City by the casinos pursuant to the agreements is not consistent with the method of allocation set forth in La.Rev.Stat. 27:93 (formerly La.Rev.Stat. 4:552). However, we disagree with the court of appeal's implicit finding that the permissive authority to levy an admission fee granted Bossier City by the statute can somehow be interpreted to obligate Bossier City to comply with the rules governing allocation of the admission fee in a completely separate agreement it negotiated with the casinos. The record is clear that Bossier City has never exercised the authority granted by La.Rev.Stat. 27:93 (formerly La.Rev.Stat. 4:552) to levy an admission fee. Because the monies paid by the casinos pursuant to the agreements are not "admission fees," the parties to the agreements are free to determine the distribution of those monies in any manner they choose, whether by allocating portions of the money to local governing authorities that would not be entitled to receive any portion of an admission fee, had it been levied, or by allocating the funds in proportions different from the allocation set forth in the statute.
We further note that, as it existed prior to the 2003 amendments, La.Rev. Stat. 27:93 (formerly La.Rev.Stat. 4:552) placed no requirements on any local governing authorities to impose admission fees on the passengers entering the riverboat casinos berthed in their territorial jurisdictions. Instead, the provision merely authorized local governing authorities to impose admission fees on such riverboat casinos. In fact, the only effect of La.Rev. Stat. 27:93 (formerly La.Rev.Stat. 4:552) during the initial 12-year period of its existence is that it gave local governing authorities, like Bossier City, an option that they otherwise would not have had to impose an admission fee on the riverboat casinos. Certainly La.Rev.Stat. 27:93 (formerly La.Rev.Stat. 4:552) cannot be considered to limit Bossier City's authority under its home rule charter to enter voluntary agreements with the riverboat casinos operating within its territorial jurisdiction. Thus, the court of appeal erred when it found that the casino revenue agreements were invalid because they established a "distribution of . . . funds contrary to what was designated." Hudson III, 39,182, p. 8, 892 so.2d at 147.
Although not addressed by the court of appeal, we also find that the casino revenue agreements are not invalid under La Rev. Stat. 27:93(B), which provided prior to the 2003 amendments that "[o]ther than to levy the admission fee authorized by Subsection A of this section, no local governing authority may license or regulate the operation of riverboats and the gaming operations conducted thereon." Just as nothing in the record supports the proposition set forth by the plaintiffs that, *894 by virtue of the casino revenue agreements, Bossier City actually levied an unauthorized tax, nothing in the record supports the proposition that, by virtue of the agreements, Bossier City is somehow licensing or regulating the operation of the riverboats and the gaming operations conducted therein. Again, all of the record evidence taken together reveals unequivocally that the parties to the casino revenue agreements voluntarily accepted the rights and responsibilities imposed by the agreements. Further, Bossier City did not issue any licenses or otherwise regulate the riverboats coincident with the bilateral execution of the voluntary agreements.
Regarding the court of appeal's third reason for finding that the casino revenue agreements are invalidthe agreements are void as against public policy, the fact that the agreements contain a provision that is void as against public policy does not mean that the agreements are invalid in their entirety. We agree with the lower courts that Section 1.5 of the casino revenue agreements, the "no-levy" clause that purports to prohibit Bossier City's right to exercise its authority to levy an admission fee, is invalid as against public policy (because the constitution prohibits Bossier City from "contract[ing] away" its authority granted by the Louisiana Legislature). La. Const. art. VII, § (1)(A). However, for the reasons that follow, we agree with the district court's decision to apply the severability provision found in Section 13 of the agreements to invalidate only the improper provision, while upholding the remainder of the agreements.
Relative to the nullity of a provision of an agreement, La. Civ.Code art. 2034 provides as follows:
Nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision.
According to the Revision Comment1984, the above article "directs the court to consider the totality of the parties' intentions before annulling the agreement when only a portion of it is null." Revision Comment1984 to La. Civ.Code art. 2034. Accordingly, like other questions of contract interpretation, whether a agreement is severable is controlled generally by the intent of the parties as expressed by the contract terms and/or language. See Lord, Richard A., Willison on Contracts, § 45.5 (4th ed.). Thus, the existence of a severability provision in a contract, "while not always regarded as conclusive, will generally be given considerable weight." Id.
In this case, the express language of the agreements is the only record evidence from which this court may discern the intent of the parties. No record evidence indicates that the parties did not intend for the illegal provision of the agreements to be severable from the remainder of the agreement. Under the express language of the agreements, "[i]f any provision . . . is held to be invalid, illegal, or unenforceable, that shall not affect or impair, in any way, the validity, legality, or enforceability of the remainder of this Agreement". Further, all the parties to the agreements contend that the district court correctly found that the invalid "no-levy" provision of the agreements is severable from the remainder of the agreements; the plaintiffs who are challenging the agreements herein are not parties to the agreements. Under the circumstances of this case, the plaintiffs had the burden of proving that the severability provision does not accurately reflect the intent of the contracting parties, and they *895 have failed to carry that burden by presenting any type of record evidence.
Our decision that the remainder of the agreements, except for the unlawful "no-levy" provision prohibiting Bossier City from levying any boarding fees, are valid is consistent with this court's decision in City of New Orleans v. The City of New Orleans Water-Works Co., 36 La. Ann. 432 (La.1884). That case involved an agreement that contained a "no-levy" clause similar to the one herein that had been breached by the governmental authority. Despite the fact that this court found that the "no-levy" provision was invalid, it nevertheless upheld the validity of the remainder of the agreement, finding that the breach of the no-levy provision did not operate to invalidate the entire agreement.
Unlike the Water-Works case, the local governmental authority herein has never attempted to levy a boarding fee, and that issue is unlikely to arise in the future given the fact that Bossier City's agreement with Capri has expired and its agreement with Horseshoe will expire in just a few months. Thus, this court is not required to consider the effect of a breach of the "no-levy" clause by the local governmental authority, but only whether the fact that that provision is void as against public policy means that the entire agreements are invalid. Based on the provisions of La. Civ.Code art. 2034, coupled with the inclusion of the express severability provision in the agreements, we disagree with the court of appeal's finding that the invalid "no-levy" clause renders the entire agreements invalid. We agree with the district court's finding that, with the exception of the "no-levy" clause, the agreements are valid and enforceable.
In light of our finding that the casino revenue agreements are valid, except for one severable provision, we pretermit discussion of the impact of the 2003 amendments on the validity of the casino revenue agreements. Since we've found the casino revenue agreements valid, we need not discuss defendant's arguments concerning of propriety of the redistribution remedy adopted by the court of appeal.

DECREE
The court of appeal decision finding that the casino revenue agreements are invalid and ordering redistribution of the funds collected pursuant to those agreements consistent with the percentages established by La.Rev.Stat. 27:93 (formerly 4:552) is hereby reversed. The decision of the district court finding that the agreements are valid, except for one severable provision, is reinstated.
REVERSED AND RENDERED.
KIMBALL, J., dissents and assigns reasons.
KIMBALL, Justice, dissenting.
I disagree with the majority's conclusion that the invalid provisions of the contract are severable. As noted by the court of appeal, Bossier City negotiated and contracted inconsistently with the collection and distribution methods authorized by statute. La. Const. art. VII, § 1(A) states, "Except as otherwise provided by this constitution, the power of taxation shall be vested in the legislature, shall never be surrendered, suspended, or contracted away, and shall be exercised for public purposes only." In negotiating the casino revenue agreements, Bossier City contractually modified the tax collection and distribution structure in direct contravention of this constitution.
The majority finds that the casino revenue agreements do not meet the definition of a tax because they were negotiated for and are not an enforced contribution. However, the agreements were negotiated for in lieu of the legislatively authorized *896 taxation. The statutorily authorized taxes served as leverage for the agreement. The fact that the collection and distribution methods were contractually negotiated for and not legislatively authorized is precisely what renders the revenue agreements invalid. Thus, I believe the casino revenue agreements are invalid in their entirety.
NOTES
[1] In 1996, the Louisiana Economic Development and Gaming Control Act was redesignated as Chapter 4 of Title 27, consisting of La. Rev. Stats. 27:41 to 27:113. See, infra.
[2] La.Rev.Stat. 4:552(A) originally provided, in pertinent part, as follows:

A. The local governing authority of the parish or municipality in which the licensed berth of a riverboat is located may levy an admission fee of up to two and one half dollars for each passenger boarding or embarking upon a riverboat.
[3] Following the 1993 amendments, La.Rev. Stat. 4:552(A) provided, in pertinent part, as follows:

(2) Funds derived from the admission fee which the local governing authority of the parishes of Caddo and Bossier or the municipalities of Shreveport and Bossier City may levy for each passenger in accordance with Paragraph (1) of this Subsection, when the riverboat is licensed to operate within their jurisdiction, shall be allocated as follows:
(a) Eighty percent to the governing authority where the boat is located.
* * * * *
(d) Five percent of the revenues collected within the parish of Bossier to the Johnny Gray Youth Shelter.
(e) Fifteen percent of the revenues collected within the parish of Bossier to the Bossier Parish School Board to be used solely for the use and purpose of the BEEF Endowment Fund.
[4] The agreements specified that $50,000 of this amount be designated for administrative expenses of the GBEDF, and that the remaining $100,000 be placed in a fund to be disbursed for economic development projects.
[5] Following the 1995 amendments, La.Rev. Stat. 4:552 stated, in pertinent part, as follows:

A. (1) The local governing authority of the parish or municipality in which the licensed berth of a riverboat is located may levy an admission fee of up to two and one-half dollars for each passenger boarding or embarking upon a riverboat; provided that in Bossier Parish and Caddo Parish an admission fee of up to three dollars may be levied. For purposes of this Section, "licensed berth" shall mean the berth, dock, facility, or boarding area from which a riverboat excursion is authorized to originate by the commission or from which a riverboat is authorized by the commission to operate.
(2) Funds derived from the admission fee which the local governing authority of the parishes of Caddo and Bossier or the municipalities of Shreveport and Bossier City may levy for each passenger in accordance with Paragraph (1) of this Subsection, when the riverboat is licensed to operate within their jurisdiction, shall be allocated as follows:
(a) Eighty percent of the revenues collected within the parish of Bossier to the governing authority where the boat is located; sixty-nine percent of the revenues collected within the parish of Caddo to the governing authority where the boat is located.
* * * * *
(e) Five percent of the revenues collected within the parish of Bossier to the Johnny Gray Youth Shelter
(f) Fifteen percent of the revenues collected within the parish of Bossier to the Bossier Parish School Board to be used solely for the use and purpose of the Bossier Education Excellence Fund, as provided in R.S. 17:408.2.
* * * * *
(I) In Bossier Parish, if the local governing authority levies an additional fifty cent admission fee as authorized by Paragraph (1) of this Subsection, the funds derived from this additional fee shall be used in their entirety for the parish road fund and shall be used to provide that Airline Drive from I-220 to the Linton Road Cutoff be made into a four-lane highway. After this project is completed the funds derived from this additional fee shall be used for general use in the parish road fund.
[6] Following the 2003 amendments, La.Rev. Stat. 27:93 provided, in pertinent part, as follows:

A. (1) The local governing authority of the parish or municipality in which the licensed berth of a riverboat is located may levy an admission fee of up to two and one-half dollars for each passenger boarding or embarking upon a riverboat; provided that in Bossier Parish, other than in Bossier City, and Caddo Parish an admission fee of up to three dollars may be levied. The governing authority of Bossier City, for each riverboat located in Bossier City in Bossier Parish, shall levy an assessment in the amount of four and five-tenths percent of the monthly net gaming proceeds as defined in R.S. 27:44(15) as the admission fee. For purposes of this Section, "licensed berth" shall mean the berth, dock, facility, or boarding area from which a riverboat excursion is authorized to originate by the commission or from which a riverboat is authorized by the commission to operate.
* * * * *
(a) Eighty percent of the revenues collected within the parish of Bossier, other than Bossier City, to the governing authority where the boat is located; sixty-nine percent of the revenues collected within the parish of Caddo to the governing authority where the boat is located.
(i) In Bossier Parish, other than Bossier City, if the local governing authority levies an additional fifty-cent admission fee as authorized by Paragraph (1) of this Subsection, the funds derived from this additional fee shall be used in their entirety for the parish road fund and shall be used to provide that Airline Drive from I-220 to the Linton Road Cutoff be made into a four-lane highway. After this project has been completed, the funds derived from this additional fee shall be used for general use in the parish road fund.
(7) The admission fee which the governing authority of Bossier City shall levy for any riverboat located within Bossier City in Bossier Parish shall be four and five-tenths percent of the monthly net gaming proceeds from each riverboat. The funds derived from the assessment of the monthly net gaming proceeds shall be allocated as follows:
(a) Two and ninety-five hundredths percent of the monthly net gaming proceeds to the city of Bossier City.
(b) Sixty-three hundredths percent of the monthly net gaming proceeds to the parish road fund for four-laning Airline Drive , and after this project has been completed the funds derived from this fee shall be used for general use by the parish road fund.
(c) Fifty-six hundredths percent of the monthly net gaming proceeds to the Bossier Educational Excellence Fund, as provided for in R.S. 17:408.2.
(d) Twenty hundredths percent of the monthly net gaming proceeds to the Bossier Parish sheriff's office.
(e) Four hundredths percent of the monthly net gaming proceeds to the Johnny Gray Jones Youth Shelter.
(f) Twelve hundredths percent of the monthly net gaming proceeds to the Greater Bossier Economic Development Foundation.
* * * * *
B. Other than to levy the admission fee, or the assessment of the monthly net gaming proceeds by the governing authority of Bossier City in Bossier Parish, authorized by Subsection A of this Section, no local governing authority may license or regulate the operation of riverboats and the gaming operations conducted thereon.
[7] The plaintiffs later decided not to pursue this action as a class action, but proceeded with their claims in their individual capacities as Bossier Parish taxpayers.
[8] Section 1.5 of the agreements further stated as follows:

Under the Agreement herein, the payment made under this Agreement are acknowledged to be in total fulfillment of [the casino's] obligation under [La.Rev.Stat. 4:552], particularly to the Johnny Gray Jones Youth Center and the Parish of Bossier to the Bossier Parish School Board, with distribution by the CITY, also the Bossier Parish Police Jury, Sheriff of Bossier parish, Bossier Parish School Board General Fund, and the Bossier Economic Development Foundation.
[9] This argument is also set forth in the amicus curiae brief filed by Caddo Parish. Further, both the relators in this case and Caddo Parish argue strenuously that execution of the court of appeal's order to redistribute the funds collected under the agreements would spell financial ruin for all the affected local governing authorities.